IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

FILED
KENNETH ... MURPHY
02 DEC 26 PM 3: 23
... SOUTHER...
WEST... ... OHIO
...AYTON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff, | : | Case No. CR-3-02-077 |
| vs. | : | Chief Judge Walter H. Rice |
| JOHN C. GOLDEN, JR., | : | |

## DEFENDANT'S MOTION TO SUPPRESS
## HIS ORAL AND WRITTEN CONFESSION

Pursuant to the Fifth Amendment to the United States Constitution, Defendant John

Golden, through undersigned counsel, hereby moves this Court for an Order suppressing: (1) his

oral confession that he gave to law enforcement on July 27, 2002; and (2) the written statements

given to law enforcement on July 27, 2002.

Respectfully submitted,

STEVEN R. KEELER
FEDERAL PUBLIC DEFENDER

(0073138)
for CAB

Cheryl A. Bennett (0063671)
Assistant Federal Public Defender
130 West Second Street, Suite 820
Dayton, Ohio 45402
(937) 225-7687

Attorney for Defendant
John Golden

## MEMORANDUM

At approximately 6:30 p.m. on July 26, 2002 the Defendant, John Golden, was taken into custody by Clark County Police. Mr. Golden had been traveling through Ohio on a greyhound bus on his way to visit his mother in Pennsylvania at the time of his arrest. At some point, between 6:30 p.m. and 10:15 p.m., Mr. Golden was transported to Clark County headquarters. During this time, the defendant maintains he was kept hand cuffed and isolated in a police cruiser while police interviewed witnesses and debated amongst themselves where he was to be taken. (TR. at 69). According to the defendant, he spent between three and four hours cuffed and alone in the cruiser. (TR. at 68-69). At approximately 10:15 p.m. that evening, the interrogation of Mr. Golden began. Mr. Golden was swabbed for DNA and was subjected to custodial interrogation by Lt. Garman and Detective Suver of the Clark County Sheriff's Office. Mr. Golden agreed to be interviewed and denied ever touching the alleged victim's vagina or private area. During this initial interrogation Officers Suver and Garman attempted to elicit a confession numerous times and employing numerous methodologies. Each attempt failed as Mr. Golden categorically denied any sexual contact with the alleged victim. The officers then had Mr. Golden execute a consent to search form. Mr. Golden agreed, but insisted that his property be searched in his presence. After Garman and Suver agreed to this stipulation, Mr. Golden's personal items were searched in front of Mr. Golden. At this time Garman and Suver again attempted to elicit a confession, often times, by warning Mr. Golden that the F.B.I. was also investigating the case. Finally, a frustrated Garman and Suver stopped questioning Mr. Golden at around midnight. During this initial questioning Mr. Golden pleaded with the officers to allow him to use the restroom and get something to drink. He was finally allowed to relieve himself several hours after being in custody. Additionally, Mr. Golden had nothing to eat and

2

drink during this process and often times spent long stretches of time isolated and alone in the interrogation room. This period of questioning between approximately 10:15 p.m. and 1:15 a.m. was recorded by video camera from Clark County headquarters and was submitted at the evidentiary hearing on this matter.[1]

At approximately 1:15 a.m. the same morning and now the 27th of July, the F.B.I. arrived. Agents Tom Mygrants and Karen Fannin of the F.B.I. introduced themselves and began questioning Mr. Golden. Specifically, the F.B.I. informed Mr. Golden that they were aware of his criminal record and had consulted numerous witnesses on the bus including the alleged victim. Mr. Golden was also informed that a physical exam had been performed on the alleged victim and that he would be better off to confess. Again, Mr. Golden agreed to answer the agents' questions and again denied ever touching the alleged victim in a sexual manner. Agents Mygrants and Fannin concluded their interrogation of Mr. Golden at approximately 2:00 a.m. Mr. Golden was left alone in the room for 2-21/2 hours until he was transported to the Montgomery County Jail at approximately 4:45 a.m. The F.B.I. interview was also videotaped and submitted as a joint exhibit.

Upon his arrival at Montgomery County Jail, Mr. Golden was booked and placed in a cell. He was given a bologna sandwich, two cookies and an orange. (TR. at 75). At approximately 9:55 a.m. Mr.Golden was brought to an interrogation room. At this point the defendant had not slept for over 24 hours and had only a bologna sandwich and some cookies to eat. Despite the entire night of interrogation by local and federal authorities, and despite Mr.

---

[1] The government has stipulated the time-line espoused by defendant in this statement of facts and has agreed that the video tapes entered into evidence represent an accurate portrayal of the interrogation that was caught on film.

Golden's continuous denial of any unlawful contact with the alleged victim, Detective Olinger of the Dayton Police Department emerged roughly *35-45 minutes* later with a Miranda waiver and both written and oral confessions from Mr. Golden. Unfortunately, unlike the previous rounds of interrogation there is no video or audio tape to be presented to this Court for review. Instead, a hearing was held by this Court where two very different stories were presented concerning that thirty or so minutes on the morning of July 27, 2002.

According to Detective Olinger, he introduced himself as a detective (he was not wearing a uniform), informed Mr. Golden that he was a suspect in a rape investigation, obtained a rights waiver, had Mr. Golden answer written questions confessing to digitally penetrating the alleged victim and execute a written apology to the victim. (TR. at 11). Further, Mr. Golden originally denied ever touching the victim, but changed his mind a very short time later. According to Detective Olinger, Mr. Golden changed his mind completely on his own. (TR. at 54).

Mr. Golden's testimony was very different. Mr. Golden testified that he was greeted by a gentleman in "street clothes" who introduced himself as a child advocate, there on behalf of the child and not affiliated with the state or police department. (TR. at 77). Mr. Golden testified that this child advocate informed him that the mother and victim did not want to press charges and that he would be sent back to Arizona for psychiatric help if his story matched that of the victim. Mr. Golden was then instructed to write out an apology to the alleged victim, and answer "yes" to the questions that allegedly matched what the victim claimed happened on the bus. Mr. Golden testified that he was told that if he agreed the stories matched, he would be on his way back to Arizona in two hours. (TR. at 80). Finally Mr. Golden testified that he was asked to sign a *Miranda* waiver form *after* he had written the apology and answered "yes" to Olinger's written questions. (TR. at 84-86). According to the Defendant, the rights form was

4

blank - no date or time was filled out- and Detective Olinger did not read him the rights on the

form out loud. After signing the form, Mr. Golden asserts that Detective Olinger began asking

about his childhood. Mr. Golden testified that he assumed the rights waiver he signed pertained

to those questions about his personal life. (TR. at 87). At this point, Detective Olinger told the

defendant that he would be back in a couple of hours and that Mr. Golden would likely be

heading home. The first time Mr. Golden asserts he knew Detective Olinger was a police

officer was later that day when he was transported to this Court for his initial appearance. (TR.

at 89). Specifically, Mr. Golden testified that he asked Detective Olinger for a card from the

children's advocacy center when he was transported to court. Detective Olinger handed Mr.

Golden a card, and the latter became aware for the first time that Olinger was in fact a police

officer. (TR. at 89).


A.    **DEFENDANT'S STATEMENTS WERE ACQUIRED IN**
      **VIOLATION OF THE RULE ANNOUNCED IN _MIRANDA_**

The Fifth Amendment privilege against self-incrimination provides that "no

person...shall be compelled in any criminal case to be a witness against himself." Police

interrogation of a suspect in custody threatens the exercise of this Fifth Amendment privilege

because of the danger that officers might actively compel confessions through overtly coercive

interrogation, or passively compel them by exposing suspects to the inherently coercive

environment created by custodial interrogation. _New York v. Quarles_, 467 U.S. 649, 654 (1984).

In _Miranda_, the Supreme Court established a prophylactic procedural mechanism that safeguards

a defendant's Fifth Amendment privilege against the inherently coercive nature of custodial

interrogation. Unless a defendant was informed of his Fifth Amendment rights _before_

5

*questioning,* any pretrial statements elicited from the defendant during custodial interrogation are inadmissible at trial. *Miranda,* 384 U.S. at 492. However, *Miranda* warnings are only required when a suspect is both in custody and subjected to state interrogation. *Illinois v. Perkins,* 496 U.S. 292, 297 (1990). In this case, there is no doubt that Mr. Golden was subjected to custodial interrogation. The issue is whether he was given his *Miranda* warnings prior to making any incriminating statements. Mr. Golden asserts that he was not, and the statements given must be suppressed.

Mr. Golden testified that he was not asked to sign the Miranda waiver until after he had written out the apology and answered the written questions. Detective Olinger testified that he read each right, had the defendant repeat them and sign the form, before initiating the interrogation. The form is signed by Mr. Golden, and witnessed by the only other person in the room - Detective Olinger. Detective Olinger testified that he made a mistake in filling out the form by placing the date in the line marked time, and corrected it immediately at 9:55 a.m. Mr. Golden testified that the waiver was blank when he signed it. (Govt. Ex. 1.1). Also, no time appears on the written questions and the apology at issue in this motion. (Govt. Ex. 1.2,2). Mr. Golden asserts that the waiver was signed only after he had complied with Detective Olinger's requests. Consequently, the statements were given in violation of Miranda, and should be excluded.

## B.  DEFENDANT'S CONFESSION WAS INVOLUNTARY

If this Court finds that Defendant's statements were not elicited in violation of *Miranda,* this Court is respectfully requested to find that his statements were involuntary as they were only extracted after he was coerced. To determine whether testimonial evidence supplied by a

6

Defendant was voluntary, a court must ask whether, in the totality of the circumstances, law enforcement obtained the evidence by overbearing the will of the accused. *Haynes v. Washington*, 373 U.S. 503, 513-14 (1963). This inquiry focuses on the: (1) conduct of law enforcement officials in creating pressure; and (2) suspect's capacity to resist that pressure. *Mincey v. Arizona*, 437 U.S. 385, 399-401 (1978).

To support a determination that a confession was coerced, the evidence must establish that: (1) the police activity was objectively coercive; (2) the coercion was sufficient to overbear the defendant's will; and (3) the defendant's will was, in fact, overborne by the coercive police activity. *McCall v. Dutton*, 863 F.2d 454, 459 (6th Cir. 1988). In determining whether the alleged coercion was sufficient to overbear an accused's will, courts evaluate the totality of the circumstances including "age, education, and intelligence of the accused; whether the accused has been informed of his constitutional rights; the length of the questioning; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as the deprivation of food or sleep." *Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir. 1994). The government must prove by a preponderance of the evidence that the confession was voluntary. *Colorado v. Connelly*, 479 U.S. 157, 168 (1985).

Mr. Golden claims that he wrote the apology and answered "yes" to certain written questions prepared by Detective Olinger because he was informed by Detective Olinger that he was not a police officer, but rather was a child advocate attempting to work out a solution to allow Mr. Golden to return home. Mr. Golden, who had been in custody and interrogated by four different law enforcement officers off and on for almost 16 hours, testified that he was told that charges would not be pressed if his story matched that of the alleged victim. Indeed, Mr. Golden testified that he thought he was meeting with his counsel at the Montgomery County Jail,

7

and it is undisputed that Detective Olinger was in plain clothes when he interviewed the Defendant. Defendant concedes that this was not the testimony of Detective Olinger, and unfortunately there was no one else present to bolster either witness' version of the events. (Again, there was no recording device used for this last interview, and as the Miranda waiver shows, the only witness present to sign the form was Detective Olinger himself.) (Govt. Ex. 1.1).

As noted above, the defendant had been awake for 24 hours when Detective Olinger began his interview at the Montgomery County Jail. The previous night Mr. Golden had been threatened and interviewed by four officers who tried desperately to elicit a confession. He also was left alone in the room or the police cruiser for up to as long as six hours while police investigated the scene. While the defendant was provided with a sandwich and some cookies at his arrival, he testified that he was still very hungry and tired when Detective Olinger arrived. It was then that the Defendant testified that he was told he was not being interviewed by the police, but rather a children's advocate.

While Detective Olinger denies making any promises or representing that he was a child advocate, he did say that he introduced himself as employed by the Child Advocacy Center. (TR. at 36). Although Detective Olinger testified that he does this to provide some background and to build rapport with the subject, it does comport with Mr. Golden's testimony. (TR. At 39). Mr. Golden did not make the Child's Advocacy Center up out of thin air, and the name does suggest that someone claiming to be employed there would be acting on behalf of the child. Once again, the Court has before it two completely different versions of what happened in the interview room at the Montgomery County Jail. If this Court is to believe the testimony of Detective Olinger, it would be to accept that the following occurred in a window of between 35-45 minutes: Detective Olinger met the Defendant, introduced himself, asked if the defendant

was feeling fine, read the entire *Miranda* waiver word for word, listened as the defendant read it back, obtained a signature on the form, filled out the form's time and date, corrected his mistake about the time, engaged in a discussion about the Defendant's family life and childhood, listened as Mr. Golden told him nothing happened on the bus, told Mr. Golden he had information to the contrary, somehow induced Mr. Golden to abandon the story he had told four other officers including two from the F.B.I., watched the defendant write out an apology, draft eight questions for Mr. Golden to sign, and ended the interview with follow up questions.

Detective Olinger was aware that Mr. Golden had been interviewed the night before and denied ever touching the alleged victim repeatedly. (TR. at 45). Detective Olinger knew that the Defendant did not incriminate himself and maintained the same story throughout the entire night. Detective Olinger surely could not have expected to find such a willing Defendant eager to confess. However, Detective Olinger testified that he was not surprised that he was so quickly able to solicit a confession when those before him, Clark County and the FBI, could not. (TR at. 64). Perhaps Detective Olinger should not have been surprised based on the circumstances around this confession. Defendant asserts that one would expect such a quick reversal when promised that the charges would be dropped and that he would be on a bus back home within a couple of hours after being in custody and interrogated for roughly 16 hours with no sleep and very little food.

Finally, when questioned about the police report, Detective Olinger conceded that he had written "it should be noted" that he introduced himself as a police officer prior to questioning at the very *end of his report*. (TR. at 61). According to Detective Olinger, he simply stuck this at the end because he wanted to detail the more important parts of the interview i.e.: the confession, first. While Detective Olinger declined putting that at the end of the report because Mr. Golden

9

expressed that he didn't know he was a detective, Mr. Golden asserts that his version - that he did not introduce himself as law enforcement until after eliciting the confessions, comports more with common sense and the 34-45 minute time-line proposed by the detective himself.

Mr. Golden does not dispute writing the apology or answering those questions he was instructed to answer by Detective Olinger. Rather, given the totality of the circumstances, and the deceit on the part of Detective Olinger, Mr. Golden asserts that his will was sufficiently overborne to render his statements involuntary.

For the forgoing reasons, Mr. Golden respectfully requests that this Court suppress any oral and written confessions because no Miranda warnings were given prior to making the statements and/or because the totality of the circumstances demonstrates that they were the result of an overborne will stemming form objective police coercion.

Respectfully submitted,

STEVEN R. KEELER
FEDERAL PUBLIC DEFENDER

(0073138)

Cheryll A. Bennett (0063671)
Assistant Federal Public Defender
130 West Second Street, Suite 820
Dayton, Ohio 45402
(937) 225-7687

Attorney for Defendant
John Golden

10

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served upon Anne Fehrman, Assistant United States Attorney, by hand delivery, this 26ᵗʰ day of December, 2002.

_____ for CAB
Cheryll A. Bennett