

FILED
KENNETH J. MURPHY
CLERK

03 JAN 29 PM 3: 52

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
WESTERN DIV. DAYTON

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CASE NO. CR-3-02-077** |
| **v.** | : | **UNITED STATES' POST HEARING MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS STATEMENTS** |
| **JOHN C. GOLDEN, JR.** | : | |
| | : | |

---

## HISTORY OF THE CASE

This matter is before the Court on the Motion to Suppress Statements originally filed by Defendant on October 7, 2002. The original motion alleged custodial interrogation without the benefit of Miranda warnings and requested a hearing in order to develop a factual basis for the motion and to present additional legal arguments. A hearing was held on November 22, 2002. Defendant filed a subsequent Motion to Suppress and Memorandum on December 26, 2002 which (1) limits the scope of Defendant's motion to the oral confession and written statements given to Detective Olinger of the Dayton Police Department on July 27, 2002 (hereinafter "the statements in issue"), and (2) argues both a lack of Miranda warnings before the statements in issue were made and the use of police coercion in obtaining the statements in issue.

The government now responds.

1




## ISSUES PRESENTED

Defendant's present motion and supporting memorandum raise the following issues:

I.)      Whether Defendant received Miranda warnings prior to making the statements in issue; and

II.)     Whether, in the absence of that Miranda violation:

      A.)      Detective Olinger made misrepresentations to Defendant that he was a child advocate representing the alleged child/victim and that Defendant could go home if he made the statements in issue; and

      B.)      If these misrepresentations were made, whether they overcame Defendant's will to resist such that they constitute the police coercion required to render the statements involuntary under a totality of the circumstances analysis.

## FACTS

### *Undisputed*

It is undisputed that the statements in issue were made during a custodial interrogation. Additionally, the bulk of what occurred from the time of Defendant's arrest in Clark County on the evening of July 26, 2002 until his interview with Detective Olinger on the morning of July 27, 2002 has been admitted into evidence by joint exhibits consisting of written stipulations and video tapes. See Joint Exhibits A, B, C, and D. Accordingly, the following facts are also undisputed:

- At approximately 10:36 p.m. on July 26, 2002, <u>Defendant was advised of his Miranda rights</u> by Lt. Garman of the Clark County Sheriff's Office. (Joint Exhibit B, 10:36 p.m.)[1]

- Lt. Garman, the other detectives, and FBI agents who interacted with

---

[1] The time of day is documented on the video tapes by a wall clock. The time shown at the start of Exhibit B is 10:15 p.m.

Defendant in Clark County were wearing street clothes at the time of their interaction. (Joint Exhibits B, C, and D.)

- While providing a consent to search to Clark County law enforcement, Defendant remarked that he had not seen a badge but believed that the Lt. and detective were proper law enforcement personnel. (Joint Exhibit B, 12:10-12:15 a.m.)

- Later, when requesting to use the phone, Defendant acknowledged his acceptance of the FBI agents as being "FBI." (Joint Exhibit D, 2:40 a.m.)

- Just prior to being advised of his Miranda rights by Lt. Garman, Defendant volunteered that he had just been released from the Bureau of Prisons and then acknowledged that he had been read his rights and been arrested before. (Joint Exhibit B, 10:35 p.m.)

- As part of advising Defendant of his Miranda rights, Lt. Garman received confirmation from Defendant that he could read, provided Defendant with a written document listing the Miranda rights, and read the Miranda rights from the document aloud to Defendant as he provided Defendant with the opportunity to read along. (Joint Exhibit B, 10:36-10:40 p.m.)

- As part of advising Defendant of his Miranda rights, Lt. Garman also received confirmation from Defendant that he understood his rights, was willing to make a statement and answer questions, did not want a lawyer, was not under the influence of drugs or alcohol, had not been threatened or promised anything, and was agreeing to talk without a lawyer. (Joint Exhibit B, 10:36-10:40 p.m.)

- At the conclusion of the verbal discussion of Miranda rights between Lt. Garman and Defendant, Defendant signed and dated a Miranda waiver form. (Joint Exhibit B, 10:40 p.m.)

- Later, just past midnight, Defendant provided verbal and written consent for law enforcement to search his bags. He was careful to condition his consent on his being present during the search. (Joint Exhibit B, 12:10-12:15 a.m.)

- Like Lt. Garman, the detective who obtained the consent to search from Defendant was wearing casual street clothes with no visible law enforcement identification. (Joint Exhibit B, 12:10-12:15 a.m.)

- Later, just after 1 a.m., two FBI agents in street clothing entered the room where Defendant was located and introduced themselves. (Joint Exhibit C, 1:15 a.m.)

- After some discussion, Special Agent Tom Mygrants of the FBI told Defendant that Defendant was not leaving tonight, that he would be taken to the Montgomery County Jail near Dayton, and that he was looking at serious charges- including federal charges. Special Agent Mygrants also explained that, in the federal system, these types of charges can result in up to life in prison and it is best to be honest. (Joint Exhibit C, 1:42 a.m.)

- The video tapes end just before 4:00 a.m. after showing the arrival of Dayton Police Officers who remove Defendant from the room. (Joint Exhibit D, 3:48-3:55 a.m.)

- Only two periods of contact with law enforcement occur during the videotaped portion of Defendant's time in Clark County that last more than five minutes: 10:15 p.m.- 11:35 p.m. and 11:52 p.m. - 1:55 a.m. (See, Joint Exhibits B, C and D.)

- The longest period of contact Defendant had with law enforcement agents during the videotaped portion of Defendant's time in Clark County was 2 hours and 3 minutes:11:52 p.m.-1:55 a.m. (See, Joint Exhibits B, C, and D)

- There were frequent periods of time depicted in the videotaped portion of Defendant's time in Clark County, some lengthy in duration, during which defendant was free from contact with law enforcement agents. (See e.g., Joint Exhibit B, 11:35 p.m. -11:52 p.m.; Joint Exhibit C, 1:55 a.m. - 2:21 a.m.; Joint Exhibit D, 2:25 a.m.- 2:40 a.m., 2:41 a.m. - 2:49 a.m.; 2:50 a.m. - 3:48 a.m.)

- Defendant was transported to the Montgomery County jail at approximately 4:30 to 5:00 a.m. on July 27, 2002 and was interviewed by Detective Olinger of the Dayton Police Department at approximately 9:55 a.m. that morning. (Joint Exhibit A.)

4

Additional facts were entered into evidence through testimony obtained during the hearing. The undisputed facts adduced therein include the following:

- During the July 27, 2002 interview with Detective Olinger, Defendant did execute the Miranda Rights waiver form that was admitted into evidence at the hearing as Government Exhibit 1.1. (Transcript, 11/22/02 Hearing: p. 84, lines 14-17; see also, Defendant's Memorandum, December 26, 2002, at 10.)

- During the July 27, 2002 interview with Detective Olinger, Defendant did complete the written document containing questions and answers that was admitted into evidence at the hearing as Government Exhibit 1.2. (Transcript, 11/22/02 Hearing: p. 82, lines 11-13, 22-25; p. 83, lines 11-16; see also, Defendant's Memorandum, December 26, 2002, at 10.)

- During the July 27, 2002 interview with Detective Olinger, Defendant did write the apology statement to the victim that was admitted into evidence at the hearing as Government Exhibit 2. (Transcript, 11/22/02 Hearing: p. 80, lines 15-17; see also, Defendant's Memorandum, December 26, 2002, at 10.)

- Defendant had been advised of Miranda rights prior to the July 26 and July 27, 2002 interviews, and he understood what they meant. (Transcript, 11/22/02 Hearing: p. 85, lines 19-22.)

- During the July 27, 2002 interview with Detective Olinger, Defendant was able to and did read his Miranda rights from the pre-interview form that was admitted into evidence at the hearing as Government Exhibit 1.1. (Transcript, 11/22/02 Hearing: p. 85, lines 24-25.)

- During the July 27, 2002 interview with Detective Olinger, Defendant knew the purpose of the rights waiver form. (Transcript, 11/22/02 Hearing: p. 87, lines 8-15.)

- During the July 27, 2002 interview with Detective Olinger, Defendant made all of the admissions and statements that Detective Olinger testified he had made. (Transcript, 11/22/02 Hearing, p. 90-91, lines 24-25 and 1-7.)

- During the July 27, 2002 interview with Detective Olinger, Defendant was not in handcuffs, had not been physically hurt, and had not been threatened by anyone. (Transcript, 11/22/02 Hearing, p. 91-92, lines 24-25 and 1-8.)

***Disputed***

Only the following facts are in dispute:

- Whether Defendant's signing of the pre-interview form during the July 27, 2002 interview with Detective Olinger that was admitted into evidence as Government's Exhibit 1.1 occurred before or after the he made the statements at issue.

- Whether the date and time areas of that pre-interview form were blank when Defendant signed the form.

- Whether, on July 27, 2002, Detective Olinger misrepresented his identity to Defendant as a child advocate who was there on behalf of the alleged child/victim and not affiliated with the state or police department.

- Whether Detective Olinger told Defendant he could go home if he made the statements in issue.

- If Detective Olinger did make such misrepresentations to Defendant, whether they would have caused a reasonable person to make the statements in issue under a totality of the circumstances analysis.

## LAW

Miranda rights are required in custodial interrogations by law enforcement in order to protect suspects from compelled testimony against themselves. <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966). When challenged, the government bears the burden of showing compliance with <u>Miranda</u> by a preponderance of the evidence. <u>Colorado v. Conelly</u>, 479 U.S. 157 (1986). Even absent a Miranda violation, a challenge to the voluntary nature of a confession also places a preponderance of the evidence burden on the government. <u>Lego v. Twomey</u>, 404 U.S. 477 (1972).

In constitutional challenges of voluntariness, coercive police conduct is a necessary predicate to finding that a confession is not voluntary. <u>Colorado v. Conelly</u>, 479 U.S. 157

(1986). Thus, an inquiry into the voluntariness of a confession focuses on the presence or absence of police coercion that overcame the accused's will to resist and does not look for any broader sense of free choice. Moran v. Burbine, 475 U.S. 412 (1986). The U.S. Supreme Court has held that the broad prohibition against threats and promises, however slight, used a century ago "does not state [the present] standard for determining the voluntariness of a confession." Arizona v. Fulminante, 499 U.S. 279 (1991). Instead, whether a confession is voluntary depends on the totality of the circumstances which includes consideration of factors such as the age, education, and intelligence of the accused; whether the accused has been informed of his constitutional rights; the length of questioning; and the use of threats and promises, etc. See, Ledbetter v. Edwards, 35 F.3d 1062, 1067 (6th Cir. 1994).

## ARGUMENT

I.    The government has met its burden of showing by a preponderance of the evidence that the Defendant received his Miranda rights prior to his making the statements in issue.

A.    *Defendant received Miranda warnings in Clark County less than twelve hours prior to making the statements now in issue and without a break in custody.*

Notably absent from Defendant's memorandum is the undisputed fact that Defendant received Miranda warnings in Clark County less than twelve hours prior to making the statements now in issue without a break in custody. (Joint Exhibit B, 10:36-10:40 p.m.; see Transcript, 11/22/02 Hearing, p.85, lines 19-22; see, Joint Exhibit A.)    In one of the stipulated video tapes admitted into evidence at the hearing as a joint exhibit, Lt. Garman of the Clark County Sheriff's Office can clearly be seen and heard advising Defendant of : his right to remain silent; the fact that anything he said could and would be used against him; his right to a

lawyer before being questioned and to have one present during questioning; his right to have a lawyer appointed for him if he could not afford one; and, in the event he decided to answer questions without a lawyer, his right to stop answering questions at any time. (Joint Exhibit B, 10:36 -10:40 p.m.)

In light of this undisputed fact, Defendant's present claim that the statements in issue should be suppressed because he did not receive Miranda warnings prior to making any incriminating statements should fail.

Further, since Defendant has limited his Miranda challenge only to whether or not he was given Miranda warnings prior to making the statements at issue (Defendant's 12/26/02 Memorandum at 6) and he has not challenged the sufficiency of the warnings he received or the voluntariness of his waiver of his Miranda rights, the Court should not reach those issues in this case.

However, even if the Court examines issues of sufficiency and voluntariness with respect to Defendant's receipt and waiver of his Miranda rights in Clark County, the evidence provided by the video tapes which were admitted into evidence at the hearing as Joint Exhibits B, C, and D clearly demonstrates that the Miranda warnings provided to Defendant in Clark County were sufficient and that his waiver was voluntary. Not only do the videos from Clark County (which were admitted into evidence as joint exhibits) clearly depict Defendant being fully advised of his Miranda rights as discussed above, it also shows Defendant waiving those rights and illustrates the voluntary nature of that waiver.

The video shows that Defendant verbally indicated that he understood his rights, was willing to make a statement and answer questions, did not want a lawyer, was not under the

influence of alcohol or drugs (other than seizure medication), had not received threats or promises, and agreed to talk without a lawyer. (Joint Exhibit B, 10:36-10:40 p.m.) The video shows Defendant receiving, signing and dating the Miranda rights waiver form. (Id.) The video shows Defendant to be free of any signs of physical abuse, mental defects, or intoxication. (Joint Exhibits B, C, and D.) It shows Defendant's ability to hold a conversation with a logical nexus between questions and answers and to narrate a detailed and meaningful story. (Id.) It shows his demeanor as alert and coherent and without any sign of undue duress or influence. (Id.) It shows him being animated and appropriately using hand gestures and voice inflections. (Id.; see, e.g., Joint Exhibit B, 10:40-10:55.) It shows he and law enforcement personnel consistently interacting with each other in a polite and congenial manner, even making jokes with each other. (Joint Exhibits B, C, and D; see e.g., Joint Exhibit B, 11:56 p.m. and Joint Exhibit C, 1;10 a.m.)

Accordingly, even if the Court examines the issues of sufficiency and voluntariness with respect to Defendant's receipt and waiver of his Miranda rights in Clark County, the evidence submitted in Joint Exhibits B, C, and D is sufficient to satisfy the government's burden, and Defendant's first claim should still fail.

> B.    *Defendant also received his Miranda warnings during his interview with Detective Olinger less than one hour prior to making the statements now in issue.*

In light of Defendant's undisputed receipt of Miranda warnings in Clark County, the Court should not reach the question of whether Defendant's receipt of his Miranda warnings from Detective Olinger occurred before or after he made the statements in issue. However, should the Court choose to decide the timing of Defendant's receipt of Miranda warnings from

Detective Olinger, it should find Detective Olinger's testimony to be credible that he gave Defendant the warnings prior to the statements in issue being made.

Detective Olinger testified that he has fifteen years of experience as a Dayton police officer, is a hostage negotiator, and has been assigned for the past four years to the sexual assault unit. (Transcript, 11/22/02 Hearing, p. 8, lines 6-11; Id. p. 52, line 25.) He testified that he is currently the detective assigned to the Child Advocacy Center.[2] (Id. at lines 11-18.) He explained that, in the scope of that position, he handles child sexual assault cases from beginning to end and interviews both the child victims and suspects in those cases. (Id.)

Detective Olinger testified that he advises suspects of their rights the same way each and every time and uses the pre-interview rights form that was undisputedly used in this case. (Id. at pp. 12-13, lines 14-25 and 1-8.) He testified that his process of going through the rights with Defendant consisted of filling out the form in Defendant's presence; putting in the date, the time, and place; then going down to the rights; advising Defendant that he was being interviewed in regard to the crime of rape[3]; and reading the enumerated paragraphs one through five to Defendant "word for word." (Id. at p. 13-14, lines 13-25 and 1.) He testified that during this process, Defendant read the enumerated paragraphs one through five back to him after he read each one and acknowledged that he understood and could read the right. (Id. at p. 13, lines 20-23; Id. at pp. 14-15, lines 23-25 and 1-7.)

---

[2]The Child Advocacy Center is staffed by the Dayton Police Department, Montgomery County Sheriff's Office, Montgomery County Prosecutor's Office, Children's Services, and child psychologists and social workers who work together as a team handling criminal sex cases and serious child abuse cases from beginning to end. (Transcript, 11/22/02 Hearing, p. 36-37, lines 22-25 and 1-20.)

[3]While Defendant is not charged with rape in the instant case, that would have been the charge presented if the case had been pursued under Ohio law rather than federal law.

He then explained how he continued by reading and having Defendant read the waiver portion of the form, discussing Defendant's level of schooling with him, confirming that he understood the rights, asking him if he wanted to talk to him without a lawyer present, if he wanted to sign the form, having Defendant fill in his years of school on the form, watching Defendant sign the form in the right hand signature block, and signing the left hand signature block himself. (Id. at pp. 14-15, lines 1-25 and 1-23.) Detective Olinger testified that their conversation then turned to the issues of Defendant's current and past life, including Defendant's family life and experiences as a child; and next went to the details of the incident. (Id. at pp. 15-16, lines 24-25 and 1-5; see also, Id. at p. 52.) Detective Olinger's testimony makes clear that he advised Defendant of the Miranda warnings prior to Defendant's making the statements in issue.

During the hearing, Detective Olinger's testimony was detailed, logical, and consistent; and his demeanor was credible. In describing the relevant events on the day of the interview, Detective Olinger was detailed not only in his description of the process and contents of interview, but was also detailed in his descriptions of his activities leading up to the interview and of Defendant's demeanor during the interview. (See e.g., Id. at pp. 9-12 and 16-17.) He provided credible reasons for the way in which he conducts his interviews, including the one at issue here. (See, e.g., Id. at pp. 52-53, lines 13-25 and 1-10.) Detective Olinger's testimony was consistent and devoid of contradictions. His eye contact, body language, voice inflections, and general demeanor suggested nothing but truthfulness as he testified.

Defendant's 12/26/02 Memorandum attempts to cast doubt on the veracity of Detective Olinger's account of this portion of the interview by noting that it was not recorded by video or audio as was most of Defendant's time in Clark County custody, by critiquing the way the time

11

and place are both written in the space on the pre-interview form marked "time," and by noting

that no time notation appears on the written questions and apology presently in issue.

(Defendant's 12/26/02 Memorandum, p. 6.)

However, those attempts to cast doubt are nothing but bald insinuations for which

Detective Olinger has provided reasonable and credible explanations. Detective Olinger

explained that he never attempts to use a recording device because his experience and expertise

in this field have resulted in his "find[ing] that people do not talk about their sexual preferences,

sexual deviations with a camera or tape recording going." (Transcript, 11/22/02 Hearing, pp. 47-

48, lines 17-25 and 1-19.) He also explained that his writing the place of the interview in the

space on the pre-interview rights form marked "time"was merely a mistake which he

immediately realized and corrected at 9:55 a.m. by writing the time above it. (Id. at p. 50, lines

2-11.) Further, Detective Olinger explained that he only puts the time on the rights form and not

on other types of statements because the pre-interview rights form is a standard form which has a

place for the time to be noted on it and the other statements are just written on a blank legal pad.

(Id. at p. 65, lines 3-12.)

In short, no reliable evidence was presented to suggest that Detective Olinger has a

propensity for untruths or that his character is in any way not credible. Instead, the only thing to

contradict Detective Olinger's testimony is the mere allegation of Defendant and the weak

insinuations discussed above. Accordingly, Defendant's first claim should fail.

Further, as discussed above, Defendant's limitation of his Miranda challenge to only the

factual question of whether or not he was given warnings prior to making the statements at issue

versus afterward (Defendant's 12/26/02 Memorandum at 6) and his failure to challenge the

sufficiency of the warnings he received or the voluntariness of his waiver of Miranda rights, should relieve this Court from reaching those issues in this case.

However, even if the Court examines the issues of sufficiency and voluntariness with respect to Defendant's receipt and waiver of his Miranda rights during his interview with Detective Olinger, the evidence provided by the testimony at the hearing and the pre-interview form admitted into evidence at the hearing clearly demonstrate that the Miranda warnings provided to Defendant by Detective Olinger were sufficient and that his waiver was voluntary.

Defendant's own testimony provides all that is necessary for a finding in the government's favor on these issues. Defendant admitted that he was getting a second wind despite being up so long and being moved back and forth. (Id., at p. 74, lines 18-22.) Defendant also admitted that he had read and signed the form during the interview with Detective Olinger. (Transcript, 11/22/02 Hearing, p. 84, lines 14-17.) He went on to admit he had done so without asking any questions because he been exposed to Miranda rights before and understood what they meant. (Id., at p. 85, lines 14-25.) He acknowledged that he had seen the form earlier in Springfield. (Id. at p.85, lines 19-20.) Defendant also admitted he understood the waiver's purpose since he testified that he had signed the form because Detective Olinger was going to ask him questions and "that is what [he] assumed that it was for." (Id. at p. 85, lines 8-10.) Thus, Defendant's own testimony confirms that he understood his Miranda rights, understood the purpose of the waiver, and signed the waiver for the purpose of answering questions from Detective Olinger.

Should the Court wish to look further, Detective Olinger's testimony also supports a finding in the government's favor. He testified that he read Defendant "word for word" the

enumerated paragraphs one through five from the pre-interview form admitted into evidence at the hearing as Government's Exhibit 1.1 and that Defendant had read each right back to him as well and acknowledged that he understood and could read and write. (Id., at pp. 13-14, lines 13-25 and 1.) The language in those enumerated paragraphs clearly includes Defendant's right to remain silent; the fact that anything he said could and would be used against him in a court of law; his right to talk to a lawyer before being questioned and to have one present during questioning; his right to have a lawyer appointed for him or provided for him by the Public Defender's Office if he could not afford one; and, in the event he decided to answer questions without a lawyer, his right to stop answering questions at any time. (Government Exhibit 1.1.)

Detective Olinger also testified that he and Defendant had both read the waiver portion of the form and that he had: discussed Defendant's level of schooling with him, confirmed that Defendant understood the rights, asked him if he wanted to talk without a lawyer present, asked him if he wanted to sign the form, and watched Defendant sign the form in the right hand signature block. (Id. at pp. 14-15, lines 1-25 and 1-23.)

Further, the waiver language on the form that Defendant admitted reading, understanding, and signing clearly indicates that, by signing the form, Defendant was acknowledging that the rights on the form had been read to him, that he understood those rights, was willing to make a statement and answer questions, did not want a lawyer, understood and knew what he is doing, had not received any threats or promises, and had not experienced any pressure or coercion of any kind. (Government Exhibit 1.1.)

Accordingly, even if the Court examines the issues of sufficiency and voluntariness with respect to Defendant's receipt and waiver of his Miranda rights during his interview with

Detective Olinger, the evidence provided by the testimony and the pre-interview form admitted into evidence at the hearing is sufficient to satisfy the government's burden, and Defendant's first claim should still fail.

II.     Defendant was not coerced by Detective Olinger into making the statements now in issue.

The only questions relevant to the issue of whether Defendant was coerced into making the statements in issue are (i) whether Detective Olinger made misrepresentations to Defendant that: he was a child advocate representing the alleged child/victim and Defendant could go home if he made the statements in issue; and (ii) if so, whether those alleged misrepresentations overcame Defendant's will to resist such that they constitute the police coercion required to render the statements involuntary under a totality of the circumstances analysis.

During the hearing, Defendant's testimony made very clear that there was only one reason he made the statements now in issue: "I agreed to those statements due to the fact that I was told if I agreed to them that I would be going home. That is the only reason that I signed or even stated." (Transcript, 11/22/02 Hearing, p. 91, lines 4-7 (emphasis added).)

He reiterated this limitation at the conclusion of the hearing when he testified that he did not make admissions for any other reason than the ones he had stated. (Id., at p. 92, lines 11-16.) A review of the transcript reveals that the reasons he had stated were as follows:

- "Because of him stating that we needed both sides to agree to what happened, you know." (Id., at p. 82, lines 20-21.)

- "So, I wrote the answers I felt were appropriate to having the stories agree so I would be released." (Id., at p. 84, lines 6-8.)

- It was not until after Detective Olinger indicated that the stories needed to match that Defendant decided to agree to the questions that Detective Olinger had written down. (Id., at p. 90, lines 11-16.)

Consequently, unless the Court were to make a factual finding that Detective Olinger made the misrepresentations alleged, Defendant's own testimony makes irrelevant the considerations of traditional issues such as of tiredness, hunger, length of interrogation, previous experience with the criminal justice system, etc., on the issue of whether Detective Olinger coerced him to make the statements at issue. Otherwise, the Court should not reach the question of whether those alleged misrepresentations overcame Defendant's will to resist, thus constituting the police coercion required to make the statements involuntary and triggering a totality of the circumstances analysis.

At the hearing, Detective Olinger presented reliable testimony that he introduced himself as "Detective Philip Olinger" and that he advised Defendant he could call address him as Phillip or Phil if he liked. (Id., at p. 36, lines 15-18.) He testified that, when he first met Defendant, he told him he was there to interview him about a crime. (Id., at p. 37, lines 21-25.) He also testified that, while he did tell Defendant he worked with children as part of his assignment to the Child Advocacy Center, he never identified himself as an employee of the Child Advocacy Center representing the victim in this case but, instead, told Defendant that he was a Detective with the Dayton Police Department who handled these sexual cases. (Id., at p. 36, lines 11-15; Id., at p. 38, lines 3-8.)

As discussed above, Detective Olinger's testimony during the hearing was logical and consistent and his was demeanor credible. Again, no evidence has been presented to suggest that Detective Olinger has a propensity for untruths or that his character is not credible. Instead, the

16

only thing to contradict Detective Olinger's testimony is the mere allegation of Defendant and weak inferences.

Defendant's 12/26/02 Memorandum attempts to cast doubt on the veracity of Detective Olinger's account of this portion of the interview by arguing: that his report does not mention the facts that he introduced himself as a police officer until the very end, that the duration of the interview seemed short for such a voluntary change in position to occur, and that he was wearing street clothes during the interview. (Defendant's 12/26/02 Memorandum, p. 9 .)

However, Detective Olinger provided a reasonable and credible explanation for the way in which he organized his report. Additionally, his experience and expertise can easily account for his success in getting Defendant to open up and tell him the truth. Finally, his ability to be recognized as a detective is supported by the undisputed facts that: the interview occurred in a jailhouse interview room, the clothing he was wearing was no less "detective-like" than the Clark County detectives and FBI agents whom Defendant previously had no problem recognizing as law enforcement; he was wearing a visible badge; he advised defendant of Miranda rights using a similar, if not identical, form to the one used by those Defendant acknowledged to be law enforcement personnel in Clark County; and he asked Defendant to sign a waiver if he wanted to talk. Defendant's argument, on the other hand, does nothing but ask the Court to rely on weak inferences.

Detective Olinger explained during his testimony that he placed the description of his introduction of himself to Defendant at the end of the report because, to him, it "wasn't as important as the contents [of the interview]." (Transcript, 11/22/02 Hearing, p.61, lines 7-11.) He explained that, unlike recording which statement is taken first and which second, he does not

17

think it matters in what part of the report the facts of the introduction are noted, just that they are recorded, and that is why he wrote "should be noted." (Id. at pp. 61-62, lines 19-25 and 1-9.)

Additionally, the facts that he has been a police officer for fifteen years, is a hostage negotiator, and has specialized in handling this type of case and interviewing this type of suspect for the past four years certainly provides a reliable basis for him to have been successful in developing a rapport with Defendant and getting him to open up and tell the truth about what happened.

Finally, Detective Olinger's uncontroverted testimony was that on this Saturday morning he was wearing a shirt and tie, no jacket, and a visible badge on his side. (Id. at p. 41, lines 3-5; Id. at p. 42, lines 3-4.) The fact that Defendant remarked on video tape that he believed the Clark County lieutenant and detective who were wearing casual street clothes and never displayed badges when he encountered them the night before were law enforcement and the fact that he was advised of Miranda rights in a jailhouse interview room and asked to sign a waiver of them if he wanted to talk, both strongly reinforce the conclusion that he would not have been led astray in his thinking due to Detective Olinger's attire.

As discussed above, Detective Olinger's testimony at the hearing was consistent and devoid of contradictions. His eye contact, body language, voice inflections, and general demeanor suggested nothing but truthfulness as he testified. No reliable evidence was presented to suggest that he has a propensity for untruths or that his character is in any way not credible.

Instead, the only thing to contradict Detective Olinger's testimony is the mere allegation of Defendant and the weak inferences discussed above. Accordingly, the Court should find in favor of the government, and Defendant's motion should fail.

Even if the Court finds against the government on the question of whether Detective Olinger made the alleged misrepresentations, it should still find in favor of the government on the question of whether the alleged misrepresentations overcame Defendant's will to resist such that they constitute the police coercion required to render the statements involuntary under a totality of the circumstances analysis.

To this end, it is undisputed that Defendant was accustomed to the workings of the criminal justice system, including encounters with law enforcement in general, law enforcement dressed in street clothing, custodial interviews, Miranda rights, etc. It is also undisputed that there were frequent periods of time depicted while Defendant was in custody in Clark County, some lengthy in duration, during which defendant was free from contact with law enforcement agents. (See e.g., Joint Exhibit B, 11:35 p.m. -11:52 p.m.; Joint Exhibit C, 1:55 a.m. - 2:21 a.m.; Joint Exhibit D, 2:25 a.m.- 2:40 a.m., 2:41 a.m. - 2:49 a.m.; 2:50 a.m. - 3:48 a.m.)

In fact, it is undisputed that only two periods of contact with law enforcement occurred that lasted more than 5 minutes during the videotaped portion of Defendant's time in Clark County: 10:15 p.m.- 11:35 p.m. and 11:52 p.m. - 1:55 a.m. (See, Joint Exhibits B, C, and D.) Additionally, it is undisputed that the longest period of contact Defendant had with law enforcement agents during the videotaped portion of Defendant's time in Clark County was 2 hours and 3 minutes: 11:52 p.m.-1:55 a.m. (See, Joint Exhibits B, C, and D.) Additionally,

Further, Defendant testified that, when he was interviewed by Detective Olinger, he had not been physically hurt and had not been threatened. (Transcript, 11/22/02 Hearing, p. 92, lines 3-8.) Moreover, Detective Olinger testified that he observed Defendant to be very alert, cooperative, not under the influence of drugs or alcohol, not sleepy, and very articulate . (Id. at p.

11, lines 15-20; Id. at p. 66, lines 10-11.) Detective Olinger went on to testify that, when he first encountered him, Defendant told him it was a good time to be interviewed and declined the need for food and drink and use of the bathroom or phone. (Id. at lines 21-25.) Finally, as discussed above, the demeanor of Defendant depicted on the videotapes taken during his time in Clark County the previous night and earlier that morning support a finding that Defendant was in full control of his faculties.

Thus, it is clear that Defendant had the background and the sensibilities to fully appreciate the meaning of his surroundings, the events that occurred, and the prosecution risks that he faced. These facts combined with the skill possessed by Detective Olinger as a very experienced interviewer and negotiator who specializes in cases dealing with sexually based crimes and developing a rapport with suspects and victims of sexual crimes provide for the likelihood that Defendant chose to confess for reasons other than being duped into believing he was not confessing to law enforcement and would simply be set free. Such a conclusion is further supported by the undisputed fact that Special Agent Mygrants of the FBI had informed Defendant shortly before his transport to the Montgomery County Jail of the likelihood of the charges being pursued federally, what that meant, and the fact that it was best to be honest. (Joint Exhibit C, 1:42 a.m.)

Accordingly, under a totality of the circumstances analysis, the Court should find that, even if Detective Olinger did make the misrepresentations alleged by Defendant, they did not overbear the will of Defendant to resist such that they constitute the police coercion required to render the statements involuntary; and Defendant's motion should still fail.

## CONCLUSION

For the foregoing reasons, the Court should find that the government has met its burden, and Defendant's motion to suppress should fail.

Respectfully submitted,

GREGORY G. LOCKHART
UNITED STATES ATTORNEY

For Anne H. Fehrman (0063511)
Assistant United States Attorney
200 West Second Street, Rm 602
Dayton, OH 45402
937-225-2910

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was mailed by regular United States mail to Cheryll A. Bennett, United States Assistant Public Defender, 130 West Second Street, Suite 820, Dayton, Ohio 45402 on the date of this filing.

For Anne H. Fehrman
Assistant U.S. Attorney